IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN DRAGUS, | ) |
|     Plaintiff, | ) ) ) |
|     v. | )   No: ) ) |
| RELIANCE STANDARD LIFE INSURANCE COMPANY, | ) ) ) |
|     Defendant. | ) ) |

## COMPLAINT

Now comes the Plaintiff, JOHN DRAGUS, by his attorneys, MARK D. DEBOFSKY, WILLIAM T. REYNOLDS and DEBOFSKY & ASSOCIATES, P.C., and complaining against the Defendant, RELIANCE STANDARD LIFE INSURANCE COMPANY, he states:

*Jurisdiction and Venue*

1. Jurisdiction of the court is based upon the Employee Retirement Income Security Act of 1974 ("ERISA"); and in particular, 29 U.S.C. §§ 1132(e)(1) and 1132(f). Those provisions give the district court jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan, which, in this case, consists of a group-long term disability ("LTD") insurance policy, underwritten and administered by Reliance Standard Life Insurance Company ("Reliance Standard"), for the benefit of employees of SMG, a venue management company operating at McCormick Place Convention Center ("McCormick Place") and Navy Pier in Chicago, Illinois, which includes Plaintiff. Additionally, this action may be brought before this court pursuant to 28 U.S.C. 1331, which gives the district court jurisdiction

over actions that arise under the laws of the United States.

2. The ERISA statute provides, at 29 U.S.C. § 1133, a mechanism for administrative or internal appeal of benefit denials. Those avenues of appeal have been exhausted.

3. Venue is proper in the Northern District of Illinois where Plaintiff was employed. 29 U.S.C. § 1132(e)(2); 28 U.S.C. § 1391.

### *Nature of the Action*

4. This is a claim seeking recovery of disability benefits claimed to be due under an employee welfare benefit plan, which provided insured long-term disability benefits under policy LTD 113908 ("the Policy"). This action is brought pursuant to ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)). Plaintiff also seeks prejudgment interest pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3), as well as attorneys' fees pursuant to 29 U.S.C. § 1132(g).

### *The Parties*

5. John Dragus ("Dragus" or "Plaintiff") age 58 (born August 1957), is and was at the time of benefit denial an employee in Chicago, Illinois; and the events, transactions, and occurrences relevant to Plaintiff's claim of disability took place predominately within the Northern District of Illinois.

6. The Defendant, Reliance Standard, was at all times relevant hereto doing business throughout the United States and within the Northern District of Illinois, and offered or delivered coverage to Plaintiff in the State of Illinois.

7. At all times relevant hereto, the LTD policy constituted "employee welfare benefit plans" as defined by 29 U.S.C. § 1002(1). Incident to his status as an employee of SMG, Plaintiff received coverage under the Policy as the "Insured" as defined by § 1002(7). This claim relates to benefits under the foregoing LTD Policy.

*Statement of Facts*

8.     Prior to January 1, 2014, Plaintiff was successfully employed on a full-time basis as a Sales Manager in the Show Operations department of SMG, a venue management company operating at McCormick Place and Navy Pier in Chicago, Illinois. A job description provided to Defendant showed that, in this role, Mr. Dragus was routinely and consistently performing tasks including but not limited to the following:

- Act as a liaison between McCormick Place, show management, and the exhibitor in determining internet and telecommunications service needs of exhibitor and/or show management, and resolving any issues of concern related to those services, including but not limited to exhibitor and/ or show management invoicing;
- Act as a technical liaison between Internet Services Group, Service Management and the Event community;
- Consult with Internet and Show management and review goals, time frame, pricing, staffing requirements, and allotment of resources;
- Identify and manage potential risks and research best practices;
- Provide hands-on assistance and customer service to Exhibitors during the Internet services ordering, utilization, change order, and billing processes;
- Employ quality assurance (QA) practices by working with the Patron and Internet Service Group to verify proper billing rates and delivery of requested services; and
- Maintain constant communications between parties before, during, and after the show (s) regarding the delivery of services, any associated issues and/or change items, and the overall status of the project.

Moreover, the job description provided to Reliance Standard detailed the "Working Environment" of the position as follows:

> The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.
>
> While performing the duties of this job, the employee may be required to work both indoors and outdoors as required by the function. Must have the physical ability to maneuver around facility(ies), at times, walking and/ or standing up to 8-10 hours daily.

3

9. In early 2011, Plaintiff underwent a three-level cervical spinal fusion at C5 through C7 in an attempt to treat severe pain caused by significant cervical spine impingement. Although he reported some initial improvement following surgical recovery, Plaintiff again began experiencing worsened cervical spine pain and arm numbness in 2012.

10. Mr. Dragus again attempted multiple pain management therapies over the next several months; however, his condition continued to cause constant, debilitating pain. On March 4, 2013, Mr. Dragus was additionally diagnosed with Generalized Anxiety Disorder, Depressive Disorder, and Pain Disorder as a result of chronic pain.

11. On May 29, 2013, a CT scan of Plaintiff's cervical spine revealed straightening of the normal cervical lordosis, disc and facet disease from C2-C3 through C4-C5, mild to moderate foraminal narrowing at C3-C4 and C4-C5, severe foraminal stenosis at C5-C6 and C6-C7, and shallow broad-based disc protrusion at T3-T4 causing mild narrowing of the spinal canal. Due to the severity of his condition and the failure of all other treatment measures, Mr. Dragus was admitted to the Rehabilitation Institute of Chicago Pain Management program on July 15, 2013 under the care of Dr. James Atchison, D.O.; and remained in the program full-time until August 9, 2013.

12. Upon his return to work following his discharge from the Pain Management program, Plaintiff was unable to sustain the initial baseline improvements the program provided and further reported worsening cognitive issues corresponding to both his cervical spine pain and his prescribed narcotic medication. On August 22, 2013, Plaintiff reported to pain treatment psychologist Kenneth Lofland, Ph.D. that he continued to suffer from deficits in concentration and memory; and on October 8, 2013, Plaintiff reported impairments in short-term memory since the previous spring, causing forgetfulness, irritability, poor concentration, and mistakes at work

to neurologist Sandeep Aggarwal M.D.

13. On January 1, 2014, Plaintiff began missing significant time from work due to the debilitating effects of his several orthopedic impairments including severe cervical spinal impairment, myofascial neck pain, upper extremity radiculopathy, and left cubital tunnel syndrome, as well as secondary neurological, cognitive, and psychiatric impairments including sensory polyneuropathy, chronic pain syndrome with symptoms of depression, anxiety, and memory loss, severe sleep impairment, and the side effects caused by his required narcotic pain medications. Mr. Dragus unsuccessfully attempted to return to work several times over the next few weeks; however; on February 7, 2014, Plaintiff received a reprimand at work due to excessive unscheduled time off and poor reliability directly attributed to his condition and the side effects of his prescribed medication. He has not worked in any capacity since February 7, 2014.

14. On February 14, 2014, Dr. Atchison noted in his office visit notes that the Plaintiff reported that "he does not feel he can continue to work at his present position as he is making many mistakes with the customers, and feels limited with his concentration." Plaintiff thereby applied for and was approved to receive short-term disability benefits under a policy definition of disability identical to the stated LTD policy.

15. On March 5, 2014, Plaintiff was re-examined by Dr. Aggarwal who noted a worsened tremor, side effects from multiple attempted medications, and ongoing impaired cognition. A neuropsychological examination performed by Christopher Stewart, Ph.D. shortly thereafter confirmed multiple areas of cognitive dysfunction including impaired attention, impulsivity, and impaired memory, as well as lower than expected results in testing of perceptual reasoning, working memory, processing speed, divided attention, novel problem solving, verbal

fluency, and confrontation naming.

16.  After exhausting short-term disability benefits and upon the expiration of the benefit-waiting period, on April 2, 2014, Plaintiff timely applied for the LTD benefits at issue here. The Policy defines disability as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>
> (1)  during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;
>
> > (a)  "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;
> >
> > (b)  "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and
>
> (2)  after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.
>
> If an Insured is employed by you and requires a license for such occupation, the loss of such license for any reason does not in and of itself constitute "Total Disability."

The policy also contains the following clarifying definition:

> "Regular Occupation" means the occupation the Insured is routinely performing when Total Disability begins. We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale.

17.  Plaintiff's application for LTD benefits was received by Defendant on April 4,

6

2014; thus, ERISA regulations required Reliance Standard to make a determination or request an extension in writing by May 19, 2014, request a second extension in writing by June 18, 2014, and make a final determination by July 18, 2014. 29 C.F.R. § 2560.503-1(f)(3). Defendant failed to adhere to any of those deadlines and provided no credible explanation for its delay.

18. On September 8, 2014, Defendant denied Plaintiff's application for disability benefits, claiming that he did not meet the Policy's definition of disability and was therefore ineligible to receive benefits set to begin on April 15, 2014 in the amount of $4,919.75 per month.

19. As a direct result of Defendant's failure to comply with ERISA regulations and issue a timely benefit eligibility determination, Plaintiff was unable to afford paying his health insurance premiums beyond October 1, 2014, causing his health insurance coverage to lapse and preventing him from keeping follow-up appointments with his treating physicians. Plaintiff reestablished health insurance coverage in January 2015 under the state insurance exchange, but remains unable to return to the care of his former specialists who are no longer in his healthcare network.

20. On February 4, 2015, internist Alan Jones, D.O. completed a residual functional capacity evaluation detailing Plaintiff's symptoms and treatment course. Dr. Jones noted Plaintiff's ongoing forgetfulness and other memory issues, myofascial pain, fatigue, and anxiety and he identified restrictions and limitations in Plaintiff's functionality caused by his ongoing cervical spine impairment. He further described Mr. Dragus' pain as severe and episodic, exacerbated by movement and prolonged sitting, and resulting in an inability to sit, stand, or walk for more than two hours per day or work at a computer. Dr. Jones further concluded that Plaintiff's "overwhelming" spinal pain, in addition to his depression and anxiety, causes

7

"constant" interference with his ability to attend and concentrate, and that "stress causes period(s) of forgetfulness, confusion, and poor recall."

21. On March 5, 2015, Dr. Aggarwal issued findings consistent with those made by Dr. Jones in a residual functional capacity evaluation he completed. Dr. Aggarwal reported that due to chronic neck pain, parasthesia of the hands and feet, and cognitive impairment, Plaintiff was unable to sit, stand, or walk for more than two hours, that he could only rarely carry 20 pounds or less, and could only rarely to occasionally tolerate flexion and rotation of the neck. Dr. Aggarwal opined that Plaintiff would be unable to tolerate even low stress jobs, and would experience "constant" interference with his attention and concentration necessary to perform simple work tasks.

22. On March 6, 2015, Plaintiff drafted and submitted an appeal of Reliance Standard's benefit denial, submitting additional medical records from Dr. Atchison, Dr. Keating, Dr. Aggarwal, and Dr. Jones establishing the severity of Plaintiff's pain to the point his physicians deemed it required surgical intervention. Plaintiff also submitted negative performance evaluations and disciplinary reports (following years of consistent positive evaluations) indicating that there was a material change in his cognitive abilities. Plaintiff specifically asserted the following challenges to the claim decision: (1) that Reliance Standard's medical assessment, which consisted of a file review rather than an examination, failed to consider the constant, radiating pain caused by Plaintiff's cervical spine impairment, (2) that Reliance Standard failed to assess Plaintiff's condition with respect to his Regular Occupation; and (3) that Reliance Standard failed to consider the full effects of Plaintiff's pain and pain medication on his cognitive abilities to perform his material duties.

23. Ignoring the weight of the medical and vocational evidence, on September 18,

2015, Reliance Standard upheld its determination to deny LTD benefits.

24. Reliance Standard's denial of benefits was based on flawed reasoning. Defendant disregarded the opinions of Mr. Dragus' multiple treating physicians and relied instead upon the opinions of non-examining, biased file-review physicians who are routinely contracted with to provide opinions favorable to Defendant. Although the Policy authorized Reliance to compel Plaintiff to attend an examination with a doctor of its choosing, Reliance never requested an examination and disregarded the consistent reports of Plaintiff's treating and examining doctors in reliance on non-examining file reviewers who did not objectively assess the evidence. Reliance Standard also disregarded Plaintiff's occupational duties, including the highly demanding cognitive requirements of his Regular Occupation.

25. As shown by the overwhelming weight of the medical evidence submitted, Reliance Standard's decision was the product of deficient medical file reviews, erroneous labor market survey reports, and an inadequate assessment of the medical and vocational evidence consistent with Reliance Standard's fiduciary obligations set forth in 29 U.S.C. § 1104(a)(1) and which require the application of "higher than marketplace quality standards" according to Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115 (2008). Therefore, Plaintiff is entitled to LTD benefits due since April 15, 2014, plus interest that has accrued thereon; and is further entitled to a declaration of rights that his benefits remain payable thereafter so long as Plaintiff continues to meet the Policy's terms and conditions.

26. All avenues of administrative appeal to Reliance Standard have now been exhausted, and this matter is therefore ripe for adjudication.

### *Relief Sought*

WHEREFORE, Plaintiff prays for the following relief:

A. That the court enter judgment in Plaintiff's favor and against the Defendant and that the court order the Defendant to pay all accrued long-term disability benefits to Plaintiff in an amount equal to the contractual amount of benefits to which he is entitled;

B. That the Court order the Defendants to pay Plaintiff prejudgment interest on all benefits that have accrued prior to the date of judgment;

C. That the Court order Defendant to continue paying Plaintiff benefits from April 15, 2014 to the present, so long as he continues to meet the policy conditions for continuance of benefits,

D. That the Court award Plaintiff his attorney's fees pursuant to 29 U.S.C. § 1132(g); and;

E. That Plaintiff be awarded any and all other contractual and/or equitable relief to which he may be entitled, as well as the costs of suit.

October 15, 2015　　　　　　　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　　　　/s/ *Mark D. DeBofsky*
　　　　　　　　　　　　　　　　　　　　　　One of the Plaintiff's Attorneys

Mark D. DeBofsky
William T. Reynolds
DeBofsky & Associates, P.C.
200 West Madison St, Suite 2670
Chicago, IL 60606
(312) 235-4880 (phone)
(312) 929-0309 (fax)