# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN DRAGUS,       )
            )
            )
    Plaintiff,     )
            )  No. 15 C 9135
            )
    v.       )  Hon. Marvin E. Aspen
            )
RELIANCE STANDARD LIFE INSURANCE )
COMPANY,       )
            )
    Defendant.    )

## <u>MEMORANDUM OPINION AND ORDER</u>

MARVIN E. ASPEN, District Judge:

Presently before us are cross-motions for summary judgment filed by Plaintiff John

Dragus and Defendant Reliance Standard Life Insurance Company ("Reliance"), as well as

Dragus' motion to supplement the administrative record.  (Dkt. Nos. 33, 38, 52.)  For the reasons

stated below, we deny Dragus' motion for summary judgment and motion to supplement the

record, and grant Reliance's cross-motion for summary judgment.

## BACKGROUND

Unless otherwise stated, the facts described herein are undisputed and culled from the

parties' Local Rule 56.1 statements of fact and the Administrative Record ("AR"). (*See* Def.'s.

Rule 56.1 Statement of Facts (Dkt. No. 48) [*hereinafter* Def.'s SOF]; Pl.'s Rule 56.1 Statement

of Facts (Dkt. No. 40) [*hereinafter* Pl.'s SOF].)  Beginning August 1, 2011, Dragus worked as a

sales manager or "internet sales manager" for SMG/McCormick Place ("SMG") in its show operations department. (Pl.'s SOF ¶¶ 10–11; Def.'s SOF ¶ 13.) According to SMG' description, show operations sales managers work "as a technical liaison" between various staff at McCormick Place to "ensure customer network and internets needs are met," as well as help "to provide internet and telecommunications services to exhibitors and show management." (Pl.'s SOF ¶¶ 12–13.)

Dragus ceased working at SMG in early 2014 due to "complaints of chronic pain, cognitive dysfunction and anxiety."[1] (Def.'s SOF ¶ 14.) From March 3, 2014 through June 1, 2014, Dragus "received short term disability benefits through a third party." (*Id.*) Thereafter, Dragus sought "payment of long term disability benefits under an employee welfare benefit plan ('Plan') sponsored and maintained by [SMG] for its eligible employees, with long term disability benefits funded by Reliance Standard Life Insurance Company, pursuant to the terms of Group Long Term Disability Policy No. LTD 113908 ('Group Policy')." (*Id.* ¶ 1.) "The Plan is governed by the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA")." (*Id.* ¶ 2.) Reliance received Dragus's claim for long term disability benefits on April 4, 2014. (*Id.* ¶ 15.)

## I.     The Group Policy

The Group Policy provides that Reliance "will pay a Monthly Benefit if an insured: (1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) Is under the regular care of a Physician; (3) Has completed the Elimination Period; and (4) Submits

---

[1] Reliance determined that Dragus stopped working on January 2, 2014, and so designated that as the "date of loss" for the purpose of his long term disability benefits claim. (Def.'s SOF ¶ 6.) Dragus states that his last day of work was in fact February 7, 2014. (Pl.'s SOF ¶ 44.) In any event, the date of loss for the purposes of Dragus benefits claim is January 2, 2014. (AR at 35.)

satisfactory proof of Total Disability." (*Id.* ¶ 9.) "Total Disability" according to the Group Policy means that "an Insured cannot perform the material duties of his/her Regular Occupation." (*Id.* ¶ 10.) "'Regular Occupation' means the occupation the Insured is routinely performing when Total Disability begins. We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale." (*Id.* ¶ 11.)

## II. Dragus' Medical Issues

Prior to Dragus' current claim for long term disability, he reported and suffered a variety of health problems. On April 10, 2014, Dragus completed an initial telephone interview as part of his claims process, in which he reported he began experience neck, shoulder, and arm pain in 2005. (Pl.'s SOF ¶¶ 17, 49.) Dragus' pain worsened in 2008, after which he "underwent multiple epidural steroid injections, cortisone injections, and physical therapy treatment sessions." (*Id.* ¶ 16.) In February 2011, Dragus underwent a "three-level spinal fusion." (*Id.* ¶ 17.) While Dragus experienced some improvement following his surgery, his pain again worsened in early 2012. (*Id.* ¶ 18.) On May 9, 2012, Dr. April Fetzer diagnosed Dragus with "left cubital tunnel syndrome and early sensory polyneuropathy." (*Id.*) Dr. Fetzer "prescribed a splint for Plaintiff's left elbow and, over the next several months, performed two facet medial branch block procedures," as well as "several trigger point injections." (*Id.*) Dragus also attended several physical therapy treatments. (*Id.*)

In February 2013, Dragus again received an "occipital nerve injection" from Dr. Fetzer, who also "prescribed a formal course of physical therapy, . . . and recommended that Mr. Dragus follow-up with a mental health provider to address his ongoing depression." (*Id.* ¶ 19.) In

March 2014, Dr. Kenneth Lofland, a clinical psychologist, "diagnosed Dragus with Generalized Anxiety Disorder, Depressive Disorder, and Pain Disorder." (*Id.* ¶ 20.) At an April 12, 2013 physical therapy appointment, Dragus "reported that he was unable to sit for two hours, unable to stand or walk for more than 40 minutes, and that he 'often has to leave work early or call in [absent] due to his symptoms.'" (*Id.* ¶ 21.) In an April 18, 2013 session with Dr. Lofland, Dragus reported problems with his memory. (*Id.* ¶ 20.)

On April 23, 2013, Dragus underwent a rhizotomy procedure. (*Id.* ¶ 22.) A rhizotomy is a "procedure in which nerve ends are targeted and destroyed through the use of an electrified hot probe in an attempt to deaden the sensory nerve to the facet joint and prevents the pain from getting to the brain." (*Id.* n.7.) At his next appointment with Dr. Fetzer, on May 23, 2013, Dragus reported no improvement in his pain since the procedure. (*Id.* ¶ 23.) At that appointment, Dr. Fetzer noted Dragus had "limited cervical range of motion," found further cervical injections were not warranted, and observed Dragus was "out of work for two weeks to recover from his acute pain, . . . per his request." (AR at 434–35; *see* Pl.'s SOF ¶ 23.) Dragus underwent a cervical spine MRI on May 29, 2013, which "reveal[ed] straightening of the normal cervical lordosis, disc and facet disease, . . . mild to moderate foraminal narrowing, . . . severe foraminal stenosis, . . . and shallow broad-based disc protrusion." (Pl.'s SOF ¶ 24.) Therafter, Dragus requested time off from work because of his medical condition, and Dr. Fetzer completed the appropriate paperwork required to authorize his time off under the Family and Medical Leave Act ("FMLA"). (AR at 380–385; *see also* Pl.'s SOF ¶ 24.) In support of Dragus' FMLA leave, Dr. Fetzer reported that "chronic positions [at] the computer inhibit proper posture which accelerates [Dragus'] pain," and that "high levels of stress and long term improper postures flare

and accelerate [Dragus'] pain levels due to [his] underlying condition." (AR at 383–84; *see also* Pl.'s SOF ¶ 24.)

In July 2013, Dragus was examined by Dr. James Atchison, who admitted him into a pain management program at the Rehabilitation Institute of Chicago. (Pl.'s SOF ¶¶ 26–27.) At the time of his admission, Dragus complained of "stabbing, hot-burning, aching, and sharp pain," which was exacerbated by "looking down, prolonged sitting, prolonged standing, and stress." (*Id.* ¶ 26; *see also* AR at 655.) Dragus further reported "psychological symptoms including depression, anxiety, apathy, fear, and irritability." (Pl.'s SOF ¶ 26.) On August 9, 2013 Dragus was discharged from the pain management program, and "was noted as showing improvement with tolerance for prolonged bimanual activities requiring reaching, carrying, and dexterity with understanding and application of ergonomic modifications an adaptions to promote activity tolerances, tolerance for lifting, bending, and pushing up to 30 pounds." (*Id.* ¶ 28.)

Dragus was examined by a neurologist, Dr. Aggarwal, on October 8, 2013. (*Id.* ¶ 31.) Dragus reported "impairments in short-term memory since the previous spring, forgetfulness, irritability, poor concentration, and that he was making mistakes at work." (*Id.*) Dr. Aggarwal "opined that Plaintiff's cognitive symptoms may be due to chronic pain, systemic factors, mood disturbance, or an early brain degenerative process requiring addition diagnostic testing." (*Id.*) In November 2013, Dragus reported to Dr. Lofland, his psychologist, that he was having continued memory problems. (*Id.* ¶ 33.)

At a follow-up appointment with Dr. James Atchison on February 14, 2014, Dragus reported that his pain was significantly worse, and that he did not believe he could continue working at SMG in his position. (*Id.* ¶ 34.) Dr. Atchison expressed to Dragus that, in his opinion, "he is not able to continue in his current position," because it "physically requires static

work and positioning of his neck and shoulders which is one of the most difficult things for him to do with his current pain problems." (*Id.*) On March 26, 2014, Dr. Atchison submitted a physician's statement "detailing [Dragus'] long-standing symptoms and stating that Mr. Dragus 'can perform [only] with significant modifications physically' and 'must limit static positioning.'" (*Id.* ¶ 35 (citing AR at 253) (alteration in original).)

Dragus saw Dr. Francis Keating, a psychiatrist, for the first time on March 29, 2014. (*Id.* ¶ 36.) Dr. Keating stated there was likely a "strong psychological component associated with [Mr. Dragus'] anxiety." (*Id.*). Dr. Keating recommended Dragus "taper his Xanax prescription to improve memory." (*Id.*)

After submitting his claim for long term disability benefits to Reliance on April 4, 2014, Dragus continued to seek medical treatment. On May 28, 2014, Dragus "underwent neuropsychological testing with Dr. Christopher Stewart," who "noted evidence that [his] pain symptoms worsened during times of stress, and reported that clinically significant distress, characterized by anxiety and depression, was also observed." (*Id.* ¶ 38.) Dr. Aggarwal, the neurologist who previously examined Dragus in October 2013, reviewed the findings of Dragus' neuropsychological examination, and stated that the examination "show[ed] cognition impair[ment] due to pain and emotional factors rather than underlying cognitive loss." (AR at 934–35; *see also* Pl.'s SOF ¶ 38.)

After he stopped working, Dragus noted some mild improvement in his condition through June 21, 2014. (*Id.* ¶ 39.) However, in August 2014, Dragus reported increases in anxiety and depression, as well as increased pain in his neck and left arm. (*Id.* ¶¶ 39–40.) Dr. Alan Jones, Dragus' primary care physician, completed a "functional capacity evaluation" on February 4, 2015. (*Id.* ¶ 42.) That evaluation noted "Dragus' severe, episodic pain was

exacerbated by movement and prolonged sitting and resulted in his inability to sit, stand, or walk for more than two hours per day." (*Id.*) Dr. Jones' evaluation also stated that "pain prevents sitting at computer." (AR at 1139; *see* Pl.'s SOF ¶ 42.) Dr. Jones further noted Dragus' "'overwhelming' spinal pain, in addition to depression and anxiety, resulted in 'constant' interference with Dragus' ability to attend and concentrate and that 'stress causes period[s] of forgetfulness, confusion, [and] poor recall.'" (Pl.'s SOF ¶ 42.) "Due to those symptoms, Dr. Jones concluded that Dragus was incapable of performing even low stress work and would likely miss four or more days of work per month." (*Id.*)

### III.    Reliance's Denial of Benefits

Reliance received Dragus' claim for long term disability benefits on April 4, 2014. (Def.'s SOF ¶ 15.) Attached to the claim was an "Attending Physician's Statement" completed by Dr. James Atchison on March 26, 2014. (*Id.*) That statement "noted diagnoses of neck pain, chronic left shoulder pain, myofascial pain, decreased range of motion and anxiety, resulting in symptoms of neck pain and shoulders pain, decreased range of motion and decreased concentration." (*Id.* ¶ 16.) Dr. Atchison further "opined that Plaintiff was restricted to alternately 3-5 hours of sitting, standing, walking and driving as well as to lifting 20 lbs"; and that Dragus "must limit static positioning." (*Id.* ¶ 17; AR at 253.) Also attached were "Medical Progress Notes" completed by Dr. Atchison on February 14, 2014, stating in part that Dragus "is not able to continue in his current position at work. He is in a position that requires static work and positioning of his neck and shoulders which is one of the most difficult things for him to do with his current pain problems." (AR at 258.) In addition, Dr. Atchison's notes stated "that ultimate determination of disability would be based on whether his [sic] job specific or if it

requires total disability pattern . . . . [I]n our opinion he certainly has some functional ability at present." (*Id.* at 259.)

After receiving Dragus' claim, Reliance determined, with the help of a Rehabilitation Specialist, that Dragus' occupation was best characterized as a combination of the Customer-Equipment Engineer and Telecommunications Specialist positions provided by the Department of Labor in the Dictionary of Occupational Titles ("DOT"). (Def.'s SOF ¶ 23.) On August 22, 2014, Reliance "referred [Dragus'] file to Professional Disability Associates for dual independent physician reviews to include a discussion by physicians specialized in psychiatry and in occupational medicine." (*Id.* ¶ 26.) Drs. Weisberg and Daniel reviewed Dragus's medical records. (*Id.* ¶ 28.) Dr. Weisberg concluded that Dragus was capable of working in his position with the following restrictions:

- Reaching at mid chest and above shoulders, occasionally (0-2.5 hrs)
- Lifting, carrying pushing and pulling 20 lbs, occasionally (0-2.5), 10 lbs frequently (2.5-5.5 hrs)
- Reaching at desk level and below, handling, fingering, feeling, motor coordination and finger and manual dexterity; constantly (>5.5 hrs)

(*Id.* ¶ 29.) Dr. Weisberg further stated that Dragus' "self reported neck pain was not supported by an MRI of the cervical spine, which showed no significant findings to support his continued pain, and his prior fusion . . . was not noted to be causing any difficulties." (*Id.* ¶ 31.) Dragus' records also "did not substantiate any nerve compression or impingement," according to Dr. Weisberg. (*Id.*) In sum, Dr. Weisberg concluded that Dragus "had the physical capability to function at the light level of physical activity for a full day of work." (*Id.* ¶ 33.)

Dr. Daniel found that Dragus' medical records supported diagnoses of "anxiety disorder, unspecified, and pain disorder, associated with physical and psychological factors." (*Id.* ¶ 34.) However, Dr. Daniel concluded that "neither diagnosis affect [sic] Plaintiff's functional

capacity." (*Id.*)  Furthermore, Dr. Daniel reviewed the results of Dragus' neuropsychological examination and concluded that Dragus "did not have any significant cognitive deficit to the degree it could impact his functional capacity."  (*Id.* ¶ 36.)  Dr. Daniel ultimately "did not find any indication in Plaintiff's medical records supportive of Plaintiff not being able to continue working in his current job beyond [January 2, 2014]."  (*Id.* ¶ 39.)

After review of Drs. Weisberg and Daniel's reports, Reliance denied Dragus' claim for long term disability on September 28, 2014.  (*Id.* ¶ 42.)  In its denial, Reliance stated:

> [T]he available medical records and information in your claim file do not support a physical or mental condition that was at a level of severity which would have rendered you unable to perform the material duties of you Regular Occupation on a full-time basis as of January 2, 2014.  Further, while the information in your claim file documents treatment for long-standing chronic neck and shoulder pain symptoms for years during a time when you were able to work Full-time for your Employer, it is expected that the medical records would document an acute change or significant deterioration in your physical or mental status on or around your work stoppage date of January 2, 2014, if your condition suddenly rendered you unable to continue working in your Regular Occupation.

(*Id.* ¶ 43.)

Dragus "submitted a request for reconsideration to Reliance on March 6, 2015," attaching additional documentation.  (*Id.* ¶ 47.)  On April 2, 2015, Reliance "contacted Network Medical Review Company" for separate reviews by independent physicians specialized in occupational medicine and psychiatry."  (*Id.* ¶ 50.)  Dr. Rater, a psychiatrist, and Dr. Freeman, an occupational medicine specialist, reviewed Dragus' documents on appeal.  (*Id.* ¶¶ 51, 55.)  After review of Dragus' medical history, Dr. Rater concluded that, while Dragus "had a long standing and chronic history of depression and anxiety," he did not have "limitations or restrictions in activities of daily living secondary to a mental health disorder."  (*Id.* ¶¶ 52–53.)  Dr. Rater also concluded that Dragus' "records did not identify mental status problems that are impacting his ability to work or would impact his ability to work."  (*Id.* ¶ 54.)

Dr. Freeman "identified Plaintiff's primary diagnoses as cervical disc disease, status post C-7 discectomy and fusion." (*Id.* ¶ 55.) After review of Dragus' medical records, Dr. Freeman concluded that "Plaintiff's medical records do not provide clinical data to substantiate the severity of Plaintiff's claimed complaints." (*Id.* ¶ 57.) Dr. Freeman thus found that Dragus could work "8 hours per day and 5 days per week at a light level on a consistent basis as of the January 2, 2014 date of loss," subject to the following restrictions:

- Sitting up to 7 hours continuously and 8 hours total per an 8-hour work day;
- Standing and walking 4 hours continuously and 7-8 hours total per an 8-hour workday;
- Climbing unrestricted;
- Lifting and Carrying up to 50 pounds of force occasionally and up to 25 pounds frequently;
- Pushing and pulling up to 75 pounds occasionally;
- Turning head and extending neck only occasionally.

(*Id.* ¶¶ 57–58.)

Reliance provided Dragus with copies of Drs. Freeman and Rater's reports on April 22, 2015, and allowed Dragus until May 29, 2015 to submit a response. (*Id.* ¶¶ 62–64.) Reliance received Dragus' response on May 29, 2015, forwarded it to Drs. Freeman and Rater for review on June 8, 2015. (*Id.* ¶¶ 64–65.) Neither doctor changed his conclusions after reviewing Dragus' response. (*Id.* ¶ 65.)

On June 24, 2015, Reliance "requested a labor market survey from WorkSource International, Inc., requesting that it be clarified whether Plaintiff's regular occupation previously identified by Reliance Standard—a combination of Customer Equipment Engineer and Telecommunications Specialist—could be performed within the restrictions and limitations identified by Dr. Freeman." (*Id.* ¶ 67.) The survey "identified 10 full time positions equivalent to Plaintiff's regular occupation," several of which reported that he could perform that role with the limitations set by Dr. Freeman. (*Id.* ¶¶ 70.) Several respondents also indicated that the

position required working more than eight hours per day.  (Pl.'s Resp. to Def.'s SOF

(Dkt. No. 47) ¶ 70.)  Accordingly, Reliance forwarded those results to Dr. Freeman, who "opined

that Plaintiff would have the ability to work more than 8 hours a day occasionally."

(Def.'s SOF ¶ 72.)

In response to the labor market survey, Dragus submitted a questionnaire completed by

Dr. Aggarwal, in which he stated his disagreement that Dragus could work longer than eight

hours per day, and that his "psychiatric symptoms and pain limited [his] ability to work."

(AR at 1383.)  Reliance forwarded Dr. Aggarwal's supplemental questionnaire to both Drs. Rater

and Freeman. (Def.'s SOF ¶ 73.)  Dr. Freeman "responded that Dr. Aggarwal's supplemental

answers to counsel's letter questionnaire did not change his mind as Dr. Aggarwal did not

provide any further clinical or exam findings in support of his assertions that could be

evaluated."  (*Id.* ¶ 74.)  Dr. Rater also "did not find Dr. Aggarwal's supplemental information

determinative because it included conclusions that focused on Plaintiff's physical capabilities,

but then identified greater functional impact based on Plaintiff's alleged emotionality at the time

of leaving work."  (*Id.* ¶ 75.)

Reliance denied Dragus' appeal on September 18, 2015.  (*Id.* ¶ 76.)  Dragus filed suit

pursuant to ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(1)(B), on

October 15, 2015.  Both parties moved for summary judgment on November 14, 2016.

(Dkt. Nos. 33, 38.)


**LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted).  A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  "In reviewing cross-motions for summary judgment, we view all facts and draw all reasonable inferences in a light most favorable to the party against whom the motion is made."  *Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l Corp. # 506*, 545 F.3d 555, 559 (7th Cir. 2008) (citation omitted), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 130 S. Ct. 2149 (2010).

## ANALYSIS

### I.    ERISA Standard of Review

"'Absent special circumstances such as fraud or bad faith,' ERISA plans that vest the administrator with discretionary authority to construe the plan's terms or determine benefit eligibility are reviewed under the arbitrary and capricious standard." *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017) (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)).  Both Dragus and Reliance agree that the Policy grants discretionary authority to the plan administrator, and so we review Reliance's decision to terminate Dragus' benefits under the arbitrary and capricious standard.  (Pl.'s Mem. ISO Mtn. for Summ. J. (Dkt. No. 34) at 6; Def.'s Mem. ISO of

Mtn. for Summ. J. (Dkt. No. 39) at 7–8.)  Accordingly, as long as it is "possible to offer a reasoned explanation, based on the evidence," for Reliance's decision, that decision is not arbitrary and capricious.  *Semien*, 436 F.3d at 812 (internal quotation marks omitted) (quoting *Trombetta v. Cragin Fed. Bank for Savings Emp. Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996)).  That is, we must "ensure only that a plan administrator's decision has rational support in the record."[2]  *Geiger*, 845 F.3d at 362 (internal quotation marks omitted) (quoting *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011)).

### A.  Conflict of Interest

Reliance is responsible for both determining whether Dragus is eligible for benefits, and for paying those benefits if he is.  Our deferential review must therefore take that conflict of interest into account when determining whether Reliance's denial of long term disability benefits to Dragus was arbitrary and capricious.  *See Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 114–15, 128 S. Ct. 2343, 2349–50 (2008).  However, "conflicts are but one factor among many that a reviewing judge must take into account."  *Id.* at 116, 128 S. Ct. at 2351.  "[A] conflict may carry more weight when the 'circumstances suggest a higher likelihood that it affected the benefits decisions' . . . .  At the same time, the conflict would carry less weight when the insurer took active steps to reduce potential bias and to promote accuracy."  *Raybourne v. Cigna Life Ins. Co of N.Y.*,

---

[2] On February 2, 2017, Dragus moved to supplement the administrative record with his favorable decision by the social security administration.  (Dkt. No. 52.)  Because the arbitrary and capricious standard of review applies, our review is limited "to the information submitted to the plan's administrator."  *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999).  We thus deny Dragus' motion to supplement the record.

700 F.3d 1076, 1082 (7th Cir. 2012) (quoting *Glenn*, 544 U.S. at 117–18,

128 S. Ct. at 2351).

Here, Reliance effectively minimized any conflict of interest that existed based on its dual role. *Id.* at 1082. For example, in its initial determination of whether Dragus was entitled to long-term disability benefits, Reliance relied solely on "independent medical reviews and opinions." (Def.'s SOF ¶ 28.) Those independent medical reviewers, in turn, "relied on various reports from [Dragus'] own physicians." *Geiger v. Aetna Life Ins. Co.*, No. 15–cv–3791, 2016 WL 3459712, at *13 (N.D. Ill. June 24, 2016), *aff'd*, 845 F.3d 357 (7th Cir. 2017). (AR at 974–75, 983.) During Dragus' appeal of its initial determination, Reliance "contacted Network Medical Review Company for separate reviews by independent physicians." (Def.'s SOF ¶ 50.) Because Reliance used only independent reviewers and Plaintiff's own medical records, we find it has "taken active steps reduce potential bias and to promote accuracy," such that we afford minimal weight to the conflict of interest owing to its dual roles. *Glenn*, 544 U.S. at 117, 128 S. Ct. at 2351.

### B. Timeliness of Reliance's Initial Determination

Dragus contends that Reliance's "initial claim determination failed to adhere to the timing guidelines prescribed by 29 C.F.R. § 2560.503-1(f)(3)," which "the recently decided *Halo v. Yale Health Plan* makes clear . . . should result in more scrutiny from the federal courts." (Pl.'s Mem. at 15 (citing *Halo v. Yale Health Plan*, 819 F.3d 41, 56 (2d Cir. 2016).) Dragus submitted his claim for long-term disability benefits to Reliance on April 2, 2014. (Pl.'s SOF ¶ 14.) Reliance denied Dragus' claim on September 29, 2014, well after the 45-day deadline. (Pl.'s SOF ¶ 57.) Reliance does not claim it requested any deadline extension, as

allowed by § 2560.503–1(f)(3).  Rather, Reliance argues that "the time to render a determination was tolled pursuant to 29 C.F.R. § 2560.503-1(i)(4)."  (Def.'s Resp. (Dkt. No. 49.) at 11.)

We agree that Reliance's initial determination was untimely.  Section 2560.503-1(i)(4) provides the period for making a benefit determination on appeal to be tolled, but says nothing of tolling the time period for initial determinations.  Given Reliance's failure to render a timely initial determination in violation of 29 C.F.R. § 2560.503-1(f)(3), Dragus was "entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits on the claim." 29 C.F.R. § 2560.503–1(l)(1).

As Dragus points out, a suit filed pursuant to § 2560.503–1(l)(1) may require a less deferential standard of review.  *See, e.g. Halo*, 819 F.3d at 52–56.  However, instead of filing suit in federal court after Reliance failed to make a timely initial determination on his claim, Dragus waited for Reliance to make both an initial determination and a determination on appeal. Dragus therefore "has waived [his] chance to take advantage of a more deferential standard of review."  *Jacobson v. SLM Corp. Welfare Ben Plan*, No. 108 C 0267, 2009 WL 2841086, at *5 (S.D. Ind. Sept. 1, 2009); *see Wilson v. Aetna Life Ins. Co.*, No. 8:15 C 752, 2016 WL 5717370, at *9 (S.D.N.Y. Sept. 30, 2016) (finding that although the plan failed to timely issue a decision on her claim, *Halo* did not require the court review the plan's denial of benefits *de novo* because the plaintiff failed to bring her claim "prior to receiving the adverse decision" and thus "waived her ability to take advantage of 29 C.F.R. § 560.503–1(l)(1)").  We therefore decline to scrutinize Reliance's determination to a greater extent than that required by the arbitrary and capricious standard of review.

## II.  Reliance's Denial of Benefits

### A.  Initial Denial of Benefits

Dragus first argues that Reliance's denial of his long-term disability benefits was arbitrary and capricious because it "cherry-picked" medical evidence that "[was] alleged to support his capability to work while ignoring large swaths of evidence corroborating [his] complaints."  (Pl.'s Mem. at 6–7.)  Specifically, he argues that the "two file reports obtained at the initial decision level were deeply flawed."  (*Id.* at 7.)  Reliance argues it reasonably relied on the medical opinions of independent physicians, who "explained their opinions by references to Plaintiff's medical records," and that there is "paucity of reliable objective evidence in Plaintiff's medical records in support of [his] contention that he was prevented from performing the material and substantial duties of his regular occupation" such that its denial of benefits was not arbitrary and capricious.  (Def.'s Mem. at 13–14.)

Dr. Weisberg's report, Dragus argues, relied on a cervical spine MRI, which he claimed "showed no evidence of nerve impingement or compression," and from which he "implausibly opined that the severe abnormalities revealed on the MRI file that demonstrated spinal stenosis and facet disc disease were not 'significant findings.'"  (Pl.'s Mem. at 7.)  Dragus further states that Dr. Weisberg "called into question [his] credibility because his 'physical exams seemed to vary as to what side he had more difficulty for rotation, left or right.'"  (Pl.'s Mem. at 7.)  Dragus contends "Dr. Weisberg offered no other statements in support of his rejection of Dragus' severe pain complaints and further failed to respond to any other finding in the record."  (*Id.*)

First, nothing in Dr. Weisberg's report indicates that he "cherry picked" medical evidence or ignored evidence that corroborates Dragus' claims.  In his report, Dr. Weisberg states he reviewed medical documents from at least 35 sources in preparing his report.  (AR at 974–75.)

He considered, for example, Dragus' previous spinal fusion surgery in 2011; examinations by Drs. Fetzer, Atchison, and Aggarwall; Dragus' examination by Dr. Stewart, a clinical psychologist; his brain MRI, conducted October 16, 2013, which revealed "mild chronic small vessel ischemic changes in the cerebral white matter"; and his cervical spine MRI conduct May 29, 2013, which showed "[m]ultilevel degenerative changes" and "[s]evere foraminal narrowing."  (AR at 974–81.)

Dr. Weisberg's report further states that the cervical spine MRI conducted on May 23, 2013 "did not show any nerve impingement or compression . . . .  Thus from a physical/structural point of view there were no significant findings to totally incapacitate the insured for the period of concern."  (AR at 979.)  Dr. Weisberg also concluded more generally that the "MRI of the cervical spine showed no significant findings to support his continued pain," and that the "EMG/NCS studies were essentially normal."  (*Id.*)  While Dragus argues Dr. Weisberg's conclusion is "implausible" and the report is "deeply flawed," he provides no explanation or citation to the record to support such a finding.  (Pl.'s Mem. at 7.)

Dragus also disputes the findings of Dr. Daniel, stating that "Dr. Daniel's psychiatric review is complete [sic] conclusory—against the findings of the actual neuropsychologist and without any understanding of the nature of Dragus' position, he simply concluded that the neuropsychological report and psychiatric records fail to show any evidence of 'significant cognitive deficit to the degree it could impact his functional capacity.'"  (*Id.*) Dragus again fails to point to any particular facts in the record , and it is therefore unclear how Dr. Daniel's report is "against the findings of the actual neuropsychologist."  (*Id.*)  Presumably, Dragus is referring to the findings of Dr. Christopher Stewart, who conducted a neuropsychological examination on May 28, 2014.  (Pl.'s SOF ¶ 38; Def.'s SOF ¶ 20; AR 939–42.)  Contrary to Dragus' assertion,

Dr. Daniel's report reflects that he seriously considered the findings of Dr. Stewart's neuropsychological examination. (AR at 986.) After reviewing the examination, Dr. Daniel concluded that "Mr. Dragus did not have any significant cognitive deficit to the degree it could impact his functional capacity." (*Id.* at 988.) While Dragus argues that Dr. Stewart's testing showed his poor performance "correlate[d] to the memory, attention, and concentration required in order for Dragus to perform his occupation," (Pl.'s Mem. at 9), Dr. Stewart's examination results do not state that Dragus' psychological condition is such that he was unable to continue working in his position at SMG, and in no way explicitly contradict Dr. Daniel's findings. (AR at 939–42.)

In addition to his conclusions regarding the neuropsychological examination, Dr. Daniels also concluded, "a diagnosis of Major Depressive Disorder is not supported by the available clinical data because depression was not his predominant clinical symptom"; a diagnosis of Panic Disorder was similarly "not supported by objective clinical criteria"; and the "available data supports the diagnosis of Anxiety Disorder," as well as "Pain Disorder Associated with Physical and Psychological Factors." (AR at 987–88.) With regard to the latter diagnoses, Dr. Daniel stated that they "are usually made on the history and subjective complaints." (*Id.* at 88.) Furthermore, Dr. Daniel concluded that "these diagnoses did not and do not affect his functional capacity." [3] (*Id.*)

---

[3] Dragus also argues that Reliance acted arbitrarily because it did not "compel[] Dragus to attend a physical examination with a physician of its choosing." (Pl.'s Mem at 10–11.) However, "obtaining an independent medical examination is 'an option, not an obligation,' for plan administrators." *Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 876 n.9 (7th Cir. 2006) (quoting *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003)). Given Reliance's reasonable reliance on other "specific reasons" for denying Dragus claim, we find that its decision not to examine Dragus does not render its denial decision arbitrary and capricious.

Finally, although several of Dragus' own physicians stated they did not believe Dragus could continue working in even a low stress job, (Pl.'s SOF ¶¶ 34, 42–43), "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007) (citation omitted). That is, Reliance did not act arbitrarily by relying on the medical reports of the independent physicians it employed in the benefit determination process, as opposed to Dragus' own doctors. To be sure, Reliance must have taken seriously the contentions of Dragus' doctors. *See, e.g., Alvarado v. Aetna Life Ins. Co.*, No. 14 CV 4717, 2016 WL 4678305, at *7 (N.D. Ill. Sept. 6, 2016) ("Defendant acted unreasonably by rejecting the opinions of two of Plaintiff's treating physicians in favor of [a reviewing doctor's] opinion, . . . [which] appears to have unduly emphasized the lack of objective evidence of Plaintiff's disability, ignored strong evidence of her subjective pain, and reached a conclusion about her ability to perform highly demanding work without identified factual support.") Here, however, Reliance used multiple independent reviewing doctors who seriously considered the evidence presenting by a large number of Dragus' medical records and, relying on those reports, Reliance gave "specific reasons" for its denial of benefits. *Id.* at 606. Accordingly, we find that Reliance's denial of Dragus' claim for long term disability benefits was not arbitrary and capricious.

## B. Dragus' Appeal

Dragus next argues that Reliance's decision to uphold its denial of long term disability benefits on appeal was arbitrary and capricious, because the independent physicians who prepared reports during Dragus' appeal "also relied upon cherry-picked or out-of-context statements to reach a conclusion divorced from the record as a whole." (Pl.'s Mem at 7.) Dr. Freeman prepared a report concerning Dragus' physical condition. Contrary to Dragus'

contention, Dr. Freeman's report shows that he considered the relevant medical data. He reports having reviewed records from 23 different sources. (AR at 1202.) He provided a detailed medical history, including the cervical spine MRI, brain MRI, lower extremity EMG, and neuropsychological evaluation, all of which Dragus places great emphasis on. (AR at 1203–05; *see also* Pl.'s Mem. at 9.) After review of the medical records, Dr. Freeman stated that "[f]rom an occupational medicine standpoint, the primary diagnoses included cervical disc disease, status post C5–7 discectomy and fusion on 02/07/11." (AR at 1206.) Dr. Freeman's discussion includes extensive references to Dragus' brain MRI, his physical therapy notes, multiple physical examinations by his doctors and psychologist, the neuropsychological evaluation, and the EMG of the lower extremities. (*Id.* at 1206–10.) Dr. Freeman concluded, after review, that "there was no significant clinical data provided to establish [the] severity of [Dragus'] complaints." (*Id.* at 1206.) While Dragus may not agree with the conclusions Dr. Freeman drew from his medical history review—namely, that Dragus is able to work full-time at a light work level—the administrative record supports the determination that Dr. Freeman did not "cherry pick" medical evidence to form the basis of that conclusion.

Dragus further argues that Dr. Rater's psychiatric review was "equally unhelpful" and ignored objective evidence. (Pl.'s Mem at 8.) In fact, the administrative record shows that Dr. Rater performed a thorough review of Dragus' medical history, upon which he based his conclusion that Dragus' mental status problems did not prohibit him from working full time. For example, Dr. Rater reviewed Dragus' medical records from 23 different sources, from which he generated a thorough medical history summary. (AR at 1192–95.) Dr. Rater concluded that Dragus' records supported diagnoses of "low-grade depression and anxiety," but that "[t]here [was] not evidence via mental status exams or reports of functioning at . . . that would impact his

work capacity." (*Id.* at 1199–1200.) Dr. Rater's answers to his questions considered Dragus'

examinations by Dr. Lofland, a psychologist, Dr, Keating's psychiatric evaluation, and Dr.

Stewart's neuropsychological examination. (AR at 1196–97.) With regard to the

neuropsychological examination, Dr. Rater's conclusions considered that Dragus' cognition

problems were "secondary to his physical condition of pain as well as associated anxiety," which

is what one of Dragus' own physician's concluded after reviewing the examination results.[4]

(AR at 934–35, 1197.) Accordingly, we find that Reliance's decision to uphold the denial of

Dragus' long-term benefits on appeal was not arbitrary and capricious.

### C. Doctor Specialties

Dragus also argues that Reliance violated 29 C.F.R. § 2560.530–1(h)(3)(iii), which

requires that, "in deciding an appeal of any adverse benefit determination that is based in whole

or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health

care professional who has appropriate training and experience in the field of medicine involved

in the medical judgment." (Pl.'s Mem. at 14.) Reliance violated that regulation, Dragus

contends, by "specifically choos[ing] physicians with certification in Occupation, Internal, or

Preventative medicine to review [his] physical symptoms." (*Id.*) Reliance should have "chosen

a physician with experience or training in *some* aspect of his impairment, whether it be

neurology, orthopedic surgery, or pain management." (*Id.*) Dragus also argues that Reliance's

"failure to have a neuropsychologist review the neuropsychological report again fails to adhere

to the requirements of § 2560.503–1(h)(3)(iii)." (*Id.*)

First, Reliance's decision to employ internal and occupational medicine specialists to

review the medical records relating to Dragus' physical symptoms was not arbitrary and

---

[4] Contrary to Dragus' assertion otherwise, none of his treating doctors found that his
neuropsychological examination revealed "disabling symptoms." (Pl.'s Resp. at 6–7.)

capricious.  Dragus relies on *Crespo v. Unim Life Ins. Co. of Am.*, which found that a plan administrator acted arbitrarily by denying the plaintiff's claim based on medical reviews that disputed her diagnoses of fibromyalgia, even though the plaintiff's treating doctors had diagnosed her with fibromyalgia, the reviewing doctors never examined her or contacted her treating doctors, and the reviewing doctors lacked the appropriate medical specialty to dispute the fibromyalgia diagnosis.  294 F. Supp. 2d 980, 987–89, 995 (N.D. Ill. 2003).  Unlike in *Crespo*, Reliance's independent reviewing physicians did not conclude that Dragus was capable of performing his occupation by disputing the diagnoses of his treating doctors.  Rather, the "medical judgment" on which Reliance's denial of benefits rested was whether or not, given the extensive medical records provided by Dragus, he was unable to perform in his occupation.

Drs. Weisberg and Freeman, the occupational medicine specialists who reviewed Dragus' medical records, did not dispute the general diagnoses of his treating doctors.  Rather, after reviewing their records, Reliance's reviewing doctors simply disagreed with their judgment regarding whether Dragus' physical symptoms were such that he could no long perform in his occupation.  *See Salomaa v. Honda Long Term Disability Plan*, 542 F. Supp. 2d 1068, 1077 (C.D. Cal. 2008) ("A plan administrator does not act improperly by distinguishing between a medical condition and the extent of the disability resulting from that condition.").  As Reliance points out, occupational medicine "focuses on the health of workers, including the ability to perform work . . . .  Practitioners in this field address the promotion of health in the work place, and the prevention and management of occupational and environmental injury, illness, and disability.  American Board of Preventive Medicine, Board Certification Requirements, *available at https://www.theabpm.org/certification.cfm.*  (Def.'s Resp. at 12.)  Drs. Weisberg and

Freeman were thus well qualified to review Dragus' medical records and determine whether his physical symptoms prevented him from performing in his occupation.

Second, the independent physicians who reviewed Dragus' medical records concerning his mental status problems were well qualified to do so. Dr. Daniel reviewed Dragus' psychological and psychiatric treatment records, including the neuropsychological examination administered by Dr. Stewart. (AR at 982–89; Def.'s SOF ¶¶ 34, 36.) Dr. Daniel has extensive training in neurology, psychology, and psychiatry. (AR at 957; *see also* Def.'s SOF ¶ 28.) He is a diplomate of the American Board of Psychiatry and Neurology, has a diploma in psychological medicine, and completed post-doctoral training in psychiatry and neurology, as well as in adult general psychiatry. (*Id.*) On appeal of Reliance's initial denial of benefits, Dr. Rater also reviewed Dragus' psychological treatment records, including the neuropsychological examination. (AR at 1191–1200.) Dr. Rater is board certified psychiatrist. (*See id.* at 1200.) Without explanation, Dragus claims that Drs. Daniel and Rater were unqualified to review the neuropsychological examination, though both specialize in psychology and psychiatry. Accordingly, we find Reliance's choice of specialists does not render their claims determination arbitrary and capricious.

### D.  Dragus' Occupation

Dragus argues that Reliance failed to properly "develop any clear understanding of [his] occupation, . . . [which] evidences an arbitrary and capricious decision." (Pl.'s Mem. at 12.) The parties agree that, according to the terms of the policy, Dragus is disabled if he "cannot perform the material duties of [his] Regular Occupation." (Def. SOF ¶ 10; Pl.'s Mem. at 11.) "'Regular Occupation' means the occupation the Insured is routinely performing when Total Disability begins." (Def.'s SOF ¶ 11.) The policy further dictates Reliance "will look at

[Dragus'] occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale." (*Id.*) To determine Dragus' "Regular Occupation," Reliance utilized the Dictionary of Occupation Titles. Based on SMG's description of Dragus' position, Reliance determined Dragus' "Regular Occupation" was a combination a Customer-Equipment Engineer position and Telecommunications Specialist position, as set out in the DOT. (Def.'s SOF ¶ 24.) "The position of Customer-Equipment Engineer is a light duty position and the position of Telecommunications Specialist is sedentary in nature." (*Id.*)

Dragus first argues that Reliance's definition of his "Regular Occupation" is "nonsensical" because, "in response to its own labor market survey, which focused on convention-venue employers across the country who utilize individuals performing the same duties as Dragus, every respondent reported that the position requires at least a medium-duty level of work along with the ability to work over eight hours a day." (Pl.'s Mem. at 12; Pl.'s Resp. at 2 ("[T]he market research study inarguably showed that the physical requirements of Dragus' job were far and beyond those of 'light duty' work.").) Dragus provides no citation for his claim that every respondent stated that his occupation requires at least a medium-duty level of work, and the administrative record does not, on its face, support that conclusion. (AR at 1341–46.) Each participant in the survey was asked first whether it offered an occupation that was a combination of the Customer-Equipment Engineer position and Telecommunications Specialist position, as set forth in the DOT. (AR at 1341.) Each participant was then asked whether an individual subject to the same labor restrictions as Dragus, as determined by Dr. Freeman, could perform that position. (*Id.*) Dragus' restrictions as determined by Dr. Freeman simply happen to match those often associated with a "medium-duty" position. (AR at 1209.)

Furthermore, Reliance admits that the labor market survey revealed that Dragus' "Regular Occupation" requires him to occasionally work more than eight hours per day. (Def.'s SOF ¶ 70.) Reliance promptly sought an addendum report from Dr. Freeman, who determined that Dragus would have the ability to work more than eight hours per day. (AR at 1349–50.)

Second, Dragus argues Reliance failed to properly consider the "cognitive demands" of his jobs, especially considering he performed his job at "one of the largest convention centers in America." (Pl.'s Mem. at 13.) Dragus has provided no support for his argument that Reliance failed to properly consider the "cognitive demands" of his job, or why it should have done so in the first place. In any event, two independent physicians concluded that Dragus' mental status problems did not prohibit him from working in his occupation, and none of his previous psychologists or psychiatrists reported otherwise. (*See* AR at 359–61, 521–24, 939–42.) Dragus also fails to demonstrate why, contrary to the Policy's language that "Regular Occupation" does not encompass the "unique duties performed for a specific employer or in a specific locale," Reliance ought to have given special weight to where Dragus worked. (Def.'s SOF ¶ 11.) Most importantly, Dragus has advanced no argument as to why Reliance's utilization of the DOT positions to determine his occupation, "as it is normally performed in the national economy," renders its determination arbitrary and capricious. (*Id.*) As Reliance argues, use of the DOT to determine a "Regular Occupation" provides "an objectively reasonable job description for assessment of disability in ERISA case[s]" in cases where the Policy states that a claimant's "Regular Occupation" is based on how the job is "normally performed in the national economy." *Myers v. Life Ins. Co. of North Am.*, No. 07–CV–6197, 2009 WL 742718, at *15–16 (N.D. Ill. March 19, 2009). (Def.'s Mem. at 10–11.) Accordingly, we find that Reliance's determination of Dragus' "Regular Occupation" does not render its denial of benefits arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, we deny Dragus' motion for summary judgment and motion to supplement the administrative record, and grant Reliance's cross-motion for summary judgment. All matters having been resolved, this case is terminated. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: March 29, 2017
        Chicago, Illinois